IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


DALE EDWARD COVERT,                )
                                   )
              Plaintiff,           )
                                   )
        v.                         )        1:11CV1156
                                   )
THE LANE CONSTRUCTION              )
CORPORATION,                       )
                                   )
              Defendant.           )


## MEMORANDUM OPINION AND ORDER

**OSTEEN, Jr., District Judge**

        Presently before this court is Defendant's Motion for

Summary Judgment (Doc. 17).  Defendant has filed a memorandum in

support of its motion (Doc. 18), Plaintiff has filed both a

response in opposition and a memorandum in support of his

response (Docs. 20 and 21, respectively), and Defendant has

filed its reply (Doc. 22).  Defendant's motion is now ripe for

adjudication, and for the reasons that follow, this court will

grant the motion in part and deny the motion in part.[1]

_____

        [1] This Memorandum Opinion and Order only addresses
Plaintiff's Family and Medical Leave Act (FMLA) claim.  The
Complaint also states a claim under the Consolidated Omnibus
Budget Reconciliation Act (COBRA) alleging that Defendant failed
to provide timely and proper notice of Plaintiff's right to
continued health coverage. (Complaint ("Compl.") (Doc. 1)
¶¶ 32-35.)  Defendant has not moved for summary judgment as to
that claim.

## I. BACKGROUND

Viewed in the light most favorable to Plaintiff, the evidence shows the following.

Dale Edward Covert ("Plaintiff") is a former employee of The Lane Construction Corporation ("Defendant").[2] He was hired in November 1998 as a laborer in the grading and stone base division, and promoted to stone base crew foreman in 2000. (Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Resp."), Attach. 1, Deposition of Dale Edward Covert ("Covert Dep.") (Doc. 20-1) at 3-6.)[3] In June 2010, Plaintiff was transferred from Defendant's grading and stone division to the paving division, maintaining his position as foreman. (Id. at 7-8; Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem."), Ex. 1, Declaration of Dominic V. Barilla, Jr. ("Barilla Decl.") (Doc. 18-1) ¶ 2.) After this transfer, the general superintendent, Dominic Barilla, became his immediate supervisor. (Barilla Decl. ¶ 2.) Barilla reported to the local

---

[2] Plaintiff worked for Rea Contracting, one of the divisions of Lane Construction, in Charlotte, North Carolina. For ease of discussion, Lane Construction and Rea Contracting will be referred to jointly as "Defendant."

[3] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

plant manager, Danny Eudy. (Pl.'s Resp., Attach. 2, Deposition of Danny Eudy ("Eudy Dep.") (Doc. 20-2) at 5; Attach. 3, Deposition of Dominic V. Barilla, Jr. ("Barilla Dep.") (Doc. 20-3) at 4.)

Plaintiff suffered a heart attack in June 2009. (Covert Dep. (Doc. 20-1) at 9.) He remained in the hospital for approximately four days. (Id. at 10.) During that time, the doctors performed a heart catheterization and placed a stent in his heart. (Id.) After his release, Plaintiff was treated by Dr. Kelling, his primary care physician. (Id. at 10-11.) He was medically released to return to work on July 26, 2009. (Id. at 12; Def.'s Mem., Ex. 2, pt. 2, Covert Dep. Exhibits (Doc. 18-3) at 4.)

During his leave, Plaintiff was placed on family and medical leave. (Covert Dep. (Doc. 20-1) at 11; Def.'s Mem., Ex. 5, pt. 2, Blackmon Dep. Exhibits (Doc. 18-8) at 2.) Defendant mailed to Plaintiff notice of his FMLA rights, a medical certification form, and other FMLA-related documents. (Def.'s Mem., Ex. 5, pt. 1, Deposition of Kristy Blackman ("Blackmon Dep.") (Doc. 18-7) at 5-6; Ex. 5, pt. 2, Blackmon Dep. Exhibits (Doc. 18-8) at 10-20.) Although Plaintiff signed and returned

the FMLA form (Blackman Dep. (Doc. 18-7) at 5; Ex. 5, pt. 2, Blackmon Dep. Exhibits (Doc. 18-8) at 2-9), Plaintiff did not realize that he had been placed on family and medical leave (Covert Dep. (Doc. 20-1) at 11).

As part of his recovery, Plaintiff attended cardiac rehabilitation sessions for several weeks, going several times each week. (Id. at 14.) He would attend a session for an hour or so in the morning and then work for Defendant. (Id. at 13-14.) Defendant accommodated his rehabilitation schedule. (Id.)

After this rehabilitation period, Plaintiff returned to active work and had no further recorded medical difficulties for approximately six months. (Id. at 15.) However, according to Defendant's records, from August 30, 2010 to September 14, 2011, Plaintiff missed work, was tardy, or left work early twenty times. (Barilla Decl. (Doc. 18-1) ¶¶ 4-5.) Although Plaintiff at times would inform Defendant that an absence was due to illness or a medical appointment, on other occasions he provided a non-health related reason or no reason at all. (Id. ¶ 5.) Plaintiff provided doctor's excuses when they were requested. (Barilla Dep. (Doc. 20-3) at 12.) Defendant paid Plaintiff for each of these absences. (Barilla Decl. (Doc. 18-1) ¶ 5.)

Plaintiff attributes these absences to a number of recurring medical conditions including weight loss, numbness, lightheadedness, nausea, and chest pains. (Covert Dep. (Doc. 20-1) at 15, 18.) Doctors could not diagnose a particular condition or determine what was causing Plaintiff's medical issues. (Id. at 17-18, 21.) Plaintiff communicated this information to Barilla. (Id. at 21; Barilla Dep. (Doc. 20-3) at 19-20.) Barilla observed Plaintiff ill at work "[f]our or five, six times." (Barilla Dep. (Doc. 20-3) at 14.)

These absences put a strain on Barilla and the other superintendents who had to cover Plaintiff's shifts. (Barilla Decl. (Doc. 18-1) ¶ 5; Barilla Dep. (Doc. 20-3) at 10; Eudy Dep. (Doc. 20-2) at 8, 14-15.) On at least several of these occasions, Plaintiff called at the last minute, leaving Barilla little time to find someone to take the shift. (Barilla Decl. (Doc. 18-1) ¶ 5.) Plaintiff and Barilla had a few discussions regarding Plaintiff's absences. (Barilla Dep. (Doc. 20-3) at 8-11, 31.) In addition, Barilla suggested in several informal conversations that Plaintiff look into short-term disability (id. at 12-13; Covert Dep. (Doc. 20-1) at 17-19); he never mentioned the possibility of family and medical leave (Barilla Dep. (Doc. 20-3) at 12). Plaintiff was not interested in short-

- 5 -

term disability because it would have required him to be out of work for a minimum of seven days. (Covert Dep. (Doc. 20-1) at 18-19.) He did discuss this possibility with his doctor, but his doctor would not certify that he was disabled. (Id. at 17-18.) Plaintiff never requested family and medical leave for his absences because he believed that the FMLA covered family rather than personal illnesses. (Id. at 19-20.)

The following events ultimately led to Plaintiff's termination. Plaintiff worked his overnight shift on Thursday, October 6, 2011. (Id. at 22.) He felt ill when he returned to his house around eight o'clock the following morning and went to sleep late that morning. (Id.) When he awoke around five o'clock that afternoon, Plaintiff felt nauseous and lightheaded, and also had diarrhea. (Id. at 23.) He called Barilla to report that he would be absent. (Id.; Def.'s Mem., Ex. 3, pt. 1, Deposition of Dominic Barilla ("Barilla Dep.") (Doc. 18-4) at 13.) Plaintiff also called his primary care physician's office and was told to go to an urgent care facility. (Covert Dep. (Doc. 20-1) at 23.) While preparing to go there, he received a phone call from the on-call doctor telling Plaintiff to proceed to the emergency room rather than the urgent care facility. (Id.) The emergency room doctor determined that Plaintiff was

"severely dehydrated" and put him on IV fluids. (Id. at 24.)
He was provided with a work release form excusing him from work
until October 11. (Id. at 32-33; Covert Dep. Exhibits (Doc.
20-5) at 2.) A superintendent had to cover Plaintiff's shifts
on October 7 and 8. (Def.'s Mem., Ex. 3, pt. 1, Barilla Dep.
(Doc. 18-4) at 13.)

On October 11, the following Tuesday, Plaintiff attended a
follow-up appointment with his primary care physician. (Covert
Dep. (Doc. 20-1) at 25.) After this appointment, Plaintiff
called Barilla, who asked Plaintiff to go to the office for a
meeting with Barilla and Eudy. (Id.) They intended to
terminate Plaintiff at this meeting. (Barilla Dep. (Doc. 20-3)
at 21-22; Eudy Dep. (Doc. 20-2) at 9.) According to Barilla, it
was the cumulative impact of Plaintiff's absences rather than a
"final incident" that led to their decision to terminate
Plaintiff. (Barilla Dep. (Doc. 20-3) at 20.) On the other
hand, when asked what motivated the October 11 meeting, Eudy
responded: "I'm sure it was from being out the previous week and
weekend. That was just –- the numbers were piling up and it was
becoming more and more intolerable." (Eudy Dep. (Doc. 20-2) at
15-16.)

- 7 -

At the meeting, Plaintiff, Eudy, and Barilla discussed
Plaintiff's absences. (Covert Dep. (Doc. 20-1) at 26.) Eudy
was aware that at least some of Plaintiff's absences were health
related. (See Eudy Dep. (Doc. 20-2) at 8.) During the meeting,
Eudy also noted that Plaintiff might be terminated if he could
not take disability leave. (Covert Dep. (Doc. 20-1) at 26; Eudy
Dep. (Doc. 20-2) at 8-11; Barilla Dep. (Doc. 20-3) at 25.)
Plaintiff told Eudy and Barilla that he had "no intentions of
missing any more time." (Covert Dep. (Doc. 20-1) at 26-27.)
Plaintiff left the meeting with the understanding that he would
work that evening if it did not rain. (Id. at 28; Barilla Dep.
(Doc. 20-3) at 25.)

After leaving the meeting, Plaintiff called his doctor's
office to ask about the procedure for being placed on disability
leave. (Covert Dep. (Doc. 20-1) at 27.) He spoke with a nurse
practitioner, who told him that he could not just be placed on
disability. (Id. at 27-28.) Plaintiff reported this
information to Barilla. (Id. at 28.)

Late that afternoon, Barilla determined that it was going
to be too wet to work that evening and asked Plaintiff to call
the crew. (Id.) After Plaintiff made these calls, they spoke
again and Barilla told Plaintiff that everything they had talked

- 8 -

about during their meeting was "kaputs" and "off the table" and that there was going to be another meeting the following morning. (Id. at 28-29.) Plaintiff believed that Eudy and Barilla "had come up with a different decision" as to how they were "going to correct the problem." (Id. at 29.) In his handwritten notes, Plaintiff wrote that he believed that they were going to terminate him at the October 12 meeting. (Def.'s Mem., Ex. 2, pt. 2, Covert Dep. Exhibits (Doc. 18-3 at 20.)

After this conversation, Plaintiff started experiencing chest pressure and tingling in his arms. (Covert Dep. (Doc. 20-1) at 30.) By the time the paramedics arrived to take him to the hospital where he was admitted that night, Plaintiff was hyperventilating. (Id. at 30-31.) Plaintiff's wife spoke with Barilla that evening and told him that Plaintiff would not be able to attend the meeting the following morning. (Id.) On the morning of either October 12 or October 13, Plaintiff's doctor performed a heart catheterization. (Id. at 31.) Plaintiff was told not to return to work until October 17, and he communicated this information to Barilla. (Id.; Barilla Dep. (Doc. 20-3) at 26-28.)

Barilla terminated Plaintiff on October 13, 2011. By that time, both Eudy and Barilla were aware of Plaintiff's

- 9 -

hospitalization.  (See Barilla Dep. (Doc. 20-3) at 26-28; Eudy
Dep. (Doc. 20-2) at 19-22.)

## II.  LEGAL STANDARD

Summary judgment is appropriate where an examination of the
pleadings, affidavits, and other proper discovery materials
before the court demonstrates that no genuine issue of material
fact exists and that the moving party is entitled to judgment as
a matter of law.  See Fed. R. Civ. P. 56.  The moving party
bears the burden of initially demonstrating the absence of a
genuine issue of material fact.  Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986).  If the moving party has met that burden,
then the nonmoving party must persuade the court that a genuine
issue remains for trial by "go[ing] beyond the pleadings" and
introducing evidence that establishes "specific facts showing
that there is a genuine issue for trial."  Id. at 324 (internal
quotation marks omitted).

In considering a motion for summary judgment, the court is
not to weigh the evidence, but rather must determine whether
there is a genuine issue for trial.  Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 249 (1986).  The court must view the facts
in the light most favorable to the nonmovant, drawing all
justifiable inferences in that party's favor.  Id. at 255.  A

mere factual dispute is insufficient to prevent summary judgment; the fact in question must be material, and the dispute must be genuine. Fed. R. Civ. P. 56; Anderson, 477 U.S. at 247-48. Material facts are those facts necessary to establish the elements of a party's cause of action. Anderson, 477 U.S. at 248. A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

## III. ANALYSIS

Defendant has moved for summary judgment as to Plaintiff's claim alleging a violation of the Family and Medical Leave Act ("FMLA"). Under the FMLA, eligible employees are entitled to "12 workweeks of leave during any 12-month period" for several reasons, including "a serious health condition that makes the employee unable to perform the functions" of his or her position. 29 U.S.C. § 2612(a)(1). Such employees have a qualified right to be restored to the same or equivalent position as the one they held when their leave commenced. 29 U.S.C. § 2614(a)(1).

It is unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1).

- 11 -

The Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights. . . . By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.

29 C.F.R. § 825.220(c).

The FMLA does not require an employee "to specifically invoke its protections in order to benefit from it." Dotson v. Pfizer, Inc., 558 F.3d 284, 293 (4th Cir. 2009); see also id. at 295 (refusing to allow employers to use their "own failure to determine whether leave should be designated as FMLA-protected to block liability"). However, an employee must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b); see also id. ("Calling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act."); Phillips v. Quebecor World RAI, Inc., 450 F.3d 308, 312 (7th Cir. 2006). After receiving adequate notice, an employer "will be expected to obtain any additional required information through informal means." 29 C.F.R. § 825.303(b).

To establish a violation of the FMLA, it is the plaintiff's burden to "prove the existence of an FMLA-qualifying condition."

- 12 -

<u>Stroder v. United Parcel Serv., Inc.</u>, 750 F. Supp. 2d 582, 589
(M.D.N.C. 2010).  "Where absences are not attributable to a
'serious health condition,' . . . FMLA is not implicated and
does not protect an employee against disciplinary action based
upon such absences."  <u>Rankin v. Seagate Techs., Inc.</u>, 246 F.3d
1145, 1147 (8th Cir. 2001).

The FMLA defines a "serious health condition" as an
"illness, injury, impairment, or physical or mental condition"
that involves either "inpatient care in a hospital, hospice, or
residential medical care facility" or "continuing treatment by a
health care provider."  29 U.S.C. § 2611(11); <u>see also</u> 29 C.F.R.
§ 825.113.  The implementing regulations issued by the Secretary
of Labor further define these terms.  Plaintiff appears to
proceed under only the "continuing treatment" portion of the
definition.  (<u>See</u> Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.
J. ("Pl.'s Mem.") (Doc. 21) at 5-7.)

The relevant regulation provides five definitions of a
"serious health condition involving continuing treatment by a
healthcare provider."  Plaintiff suggests that two of these
definitions are relevant to his case.  Those definitions provide
in relevant part:

- 13 -

A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

    (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

    (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

    (3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.

    (4) Whether additional treatment visits or a regimen of continuing treatment is necessary within the 30-day period shall be determined by the health care provider.

. . . .

(c) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

- 14 -

(1) Requires periodic visits (defined as at
least twice a year) for treatment by a
health care provider, or by a nurse under
direct supervision of a health care
provider;

(2) Continues over an extended period of
time (including recurring episodes of a
single underlying condition); and

(3) May cause episodic rather than a
continuing period of incapacity (e.g.,
asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115.  "The term treatment includes (but is not

limited to) examinations to determine if a serious health

condition exists and evaluations of the condition."  29 C.F.R.

§ 825.113(c).

### **Serious Health Condition**

Because the FMLA does not protect all absences, this court

first considers whether Plaintiff has presented evidence that

any of his absences were covered by the FMLA because he had a

serious health condition.  The absences are addressed in three

categories: (1) those from August 30, 2010 to September 14,

2011, which Plaintiff contends were the result of a chronic

serious health condition; (2) the absences resulting from

Plaintiff's condition from October 7, 2011 to October 11, 2011;

and (3) the absences resulting from Plaintiff's condition from
October 12, 2011 to October 17, 2011.[4]

As to the first category of absences, those from August 30,
2010 to September 14, 2011, because he was never incapacitated
for more than three consecutive days, Plaintiff proceeds under
the argument that he had a chronic serious health condition.
The FMLA covers "[a]ny period of incapacity or treatment for
such incapacity due to a chronic serious health condition."
29 C.F.R. § 825.115(c).  As noted above, a chronic serious
health condition is one that requires periodic treatment,
continues over an extended period of time, and may result in
periodic incapacity.  Id.

This court finds that Plaintiff has not presented
sufficient evidence to preclude summary judgment as to his
absences from August 30, 2010 to September 14, 2011.  Although
Plaintiff testified that these absences were the result of
medical issues including weight loss, numbness, lightheadedness,
nausea, and chest pains, he has presented no evidence that any
symptoms or treatment during this period were related to a

---

[4] In his response, Plaintiff appears to argue that his
absences from August 30, 2010 through October 2011 constitute a
single FMLA-qualifying condition under 29 C.F.R. § 825.115(c)
and (e).  (Pl.'s Mem. (Doc. 21) at 7.)  For the reasons
discussed hereinafter, this court disagrees.

chronic condition as opposed to unrelated medical issues.  A
review of the stated reasons for the absences shows
representations like "dead car battery" and "wedding."  (Barilla
Decl. (Doc. 18-1) ¶ 4.)  Additionally, other stated reasons
suggest isolated medical issues rather than chronic conditions.
For example, Plaintiff had partial-day absences for a doctor's
appointment related to an auto accident and to take his wife to
the doctor.  (Id.)  Plaintiff has neither rebutted this evidence
nor provided any medical testimony that would allow a reasonable
jury to infer that his other absences were related to each
other.  There may have been some similarity of symptoms
exhibited on these occasions, but the evidence presented at
summary judgment would require speculation as to whether
Plaintiff had a chronic serious health condition.[5]

     With respect to the second category of absences, that is,
those resulting from Plaintiff's condition from October 7 to
October 11, this court finds that Plaintiff has presented
evidence from which a reasonable jury could find that he had a

_____

     [5] This finding is not based on the fact that Plaintiff was
never diagnosed with a particular condition.  See Krenzke v.
Alexandria Motor Cars, Inc., 289 F. App'x 629, 634 (4th Cir.
2008) ("[T]he framework created by the FMLA and its accompanying
regulations focus on the impact of the symptoms and the scope of
the treatment, not just the diagnosis which is eventually
made."); see also Miller v. AT & T Corp., 250 F.3d 820, 835 (4th
Cir. 2001).

                              - 17 -

serious health condition on those dates.  Plaintiff had a "serious health condition" during this period if he was incapacitated for "more than three consecutive, full calendar days" and received treatment "two or more times."  See 29 C.F.R. § 825.115(a).

This court has found little authority interpreting the phrase "more than three consecutive, full calendar days."  The Eleventh Circuit, however, has held that this regulation requires only "a period of continuous incapacity extending more than 72 hours."  Russell v. N. Broward Hosp., 346 F.3d 1335, 1338 (11th Cir. 2003).  This court adopts that interpretation.

Here, Plaintiff has presented evidence that he had a serious health condition from October 7 to October 11.  He went to the emergency room the evening of October 7.  After treatment, he was provided with a work release note stating that he could return to work on October 11.  Therefore, Plaintiff has presented evidence that he was incapacitated for "more than three consecutive, full calendar days."  He has also presented evidence that he received treatment a second time when he attended his follow-up appointment with his primary care physician.  Barilla and Eudy knew that Plaintiff had been out of work since October 7.  Furthermore, according to Plaintiff, when

- 18 -

he spoke with Barilla the morning of October 11, he told Barilla that he was leaving his doctor's office. (Covert Dep. (Doc. 20-1) at 25.) Thus, there is evidence that Barilla and Eudy should have been aware that the FMLA may have covered Plaintiff's absences during this period.

Plaintiff "was sufficiently ill to see a physician two times in a period of just a few days and that is all that the plain language of" the regulation "requires for 'continuing treatment.'" See Thorson v. Gemini, Inc., 205 F.3d 370, 379 (8th Cir. 2000); see also Miller, 250 F.3d at 830 (second visit to a physician as result of the flu during which the physician "conducted a physical examination and drew blood" constituted "treatment").

For similar reasons, Plaintiff has presented evidence that he also had a serious health condition from October 12 to October 17. In addition to the length of his incapacity, Plaintiff has presented evidence that he was hospitalized overnight, during which time the doctors performed a catheterization. (Covert Dep. (Doc. 20-1) at 30-31.) Thus, he has also presented evidence to support a finding of a serious health condition based on inpatient care. See 29 C.F.R. § 825.114 ("Inpatient care means an overnight stay in a hospital

. . . , including any period of incapacity as defined in §
825.113(b), or any subsequent treatment in connection with such
inpatient care.").

### Interference[6]

To prevail on an interference claim under 29 U.S.C.
§ 2615(a)(1), a plaintiff must establish that: "(1) he was
eligible for the FMLA's protections, (2) his employer was
covered by the FMLA, (3) he was entitled to leave under the
FMLA, (4) he provided sufficient notice of his intent to take
leave, and (5) his employer denied him FMLA benefits to which he
was entitled." Burnett v. LFW Inc., 472 F.3d 471, 477 (7th Cir.
2006); see also Sanders v. City of Newport, 657 F.3d 772, 778
(9th Cir. 2011); Hoge v. Honda of Am. Mfg., Inc., 384 F.3d 238,
244 (6th Cir. 2004); Ainsworth v. Loudon Cnty. Sch. Bd., 851
F. Supp. 2d 963, 975 (E.D. Va. 2012). For interference claims,

---

[6] The Complaint alleges that Defendant violated the FMLA "by
terminating Plaintiff for his otherwise FMLA covered absences
and/or interfering with his FMLA rights." (Compl. (Doc. 1)
¶ 28.) As noted by Defendant, it is not clear from the face of
the Complaint whether Plaintiff is proceeding under a
discrimination or an interference theory. Defendant addressed
both theories, but Plaintiff did not respond to the retaliation
argument. Therefore, this court will construe Plaintiff's claim
based on his discharge as one for interference with his
entitlements under the FMLA. See Kauffman v. Fed. Express Corp.,
426 F.3d 880, 884 (7th Cir. 2005) ("A claim under the FMLA for
wrongful termination can be brought under either a
discrimination/retaliation or interference/entitlement theory.").

"no finding of ill intent is required."  Burnett, 472 F.3d at 477.

Employees have a qualified right to restoration upon returning from FMLA leave.  See 29 U.S.C. § 2614(a).  However, "the FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave."  Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 547 (4th Cir. 2006); see also 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period.").  If an employee is terminated while taking FMLA leave, the employer's responsibility to "restore the employee cease[s] at the time the employee is laid off . . . .  An employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration."  29 C.F.R. § 825.216(a)(1).  The Fourth Circuit has not yet resolved whether this regulation places the ultimate burden of proof on the employer. See Yashenko, 446 F.3d at 549.

The parties do not dispute that Defendant is a covered employer and that, while employed, Plaintiff was a covered

employee.  Because this court has already addressed whether

Plaintiff has presented evidence that any of his absences were

FMLA-protected, the primary issue remaining for purposes of

Plaintiff's interference claim is whether Eudy and Barilla would

have still terminated Plaintiff if absences protected by the

FMLA had been ignored.  As discussed above, this court finds

that Plaintiff has presented evidence from which a reasonable

jury could find that Plaintiff's absences from October 7 to

October 11 were the result of a serious health condition.

This court also finds that Plaintiff has presented

sufficient evidence that FMLA-protected absences were a

motivating factor in the decision to terminate him.  When asked

during his deposition what motivated the conversation on

October 11, Eudy responded: "I'm sure it was from being out the

previous week and weekend.  That was just -- the numbers were

piling up and it was becoming more and more intolerable."  (Eudy

Dep. (Doc. 20-2) at 15-16.)  Therefore, this court finds that a

triable issue of fact remains as to the role any FMLA-protected

absences played in the decision reached by Eudy and Barilla to

terminate Plaintiff.

Because an issue of fact remains regarding the effect of

Plaintiff's absences from October 7 to October 11 in the

- 22 -

termination decision, this court finds that summary judgment should be denied as to Plaintiff's absences in October, 2011, as related to Plaintiff's claim of interference under 29 U.S.C. § 2615(a)(1).

## IV. CONCLUSION

For the reasons set forth herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. 17) is **GRANTED IN PART AND DENIED IN PART**. The motion is **DENIED** as to Plaintiff's interference claim based on absences resulting from his health condition from October 7 to October 11 and from October 12 to October 17. The motion is **GRANTED** as to Plaintiff's interference claim based on all other absences.

This the 29th day of March, 2013.

_William L. Osteen, Jr._
United States District Judge

- 23 -